**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jack IVEY and William "Rusty"
Wallace, III, Defendants–
Appellants.**

**No. 90–8724.**

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1991.

Dan Newsome, Marfa, Tex. (Court-appointed), for Jack Ivey.

Ronald J. Waska, Harry N. Monck, Houston, Tex., for William "Rusty" Wallace, III.

Joseph H. Gay, Jr., LeRoy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S.

Atty., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, WILLIAMS and BARKSDALE, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants Jack Ivey and William "Rusty" Wallace, III were indicted and convicted of one count of conspiracy to buy bobcat hides brought into the United States from Mexico contrary to law and several counts of smuggling contrary to 16 U.S.C. § 1538(c)(1) and 50 C.F.R. § 23.11(b)(1). Both appellants assert that the jury verdict should be reversed due to defects in the indictment and the jury charge as well as insufficiency of the evidence. Appellant Ivey also appeals based on a claim of entrapment and outrageous government conduct. We find the appellants' arguments unpersuasive and affirm the district court's ruling.

## I.  FACTS

The facts of this case are not in dispute. In 1986, the United States Fish and Wildlife Service received intelligence information that large numbers of bobcat hides were entering the country from Mexico in violation of United States law. In response, the government initiated an undercover operation to identify those individuals involved in the illegal fur trade. As part of the operation, the government opened a store named the "Van Horn Fur House." In addition, the government hired Tinsley Means, who had experience in the fur trade, to aid it in entering the stream of commerce of the fur trade.

John Keeler and Dan Marshall, agents of the Fish and Wildlife Service, were assigned to this project. They were to establish what is known as a "reverse sting." They were to purchase pelts they believed to have been trapped in Mexico and smuggled into the United States, and then they would resell those pelts to other fur buyers.

The investigation revealed the likelihood that Jack Ivey and William "Rusty" Wallace were involved in the trafficking of illegally smuggled furs. Ivey and Wallace were both employees of the D & W Fur Company in Alpine, Texas, and they had established an extensive network of trappers and other individuals to procure and smuggle Mexican bobcat furs into the United States. In order to conceal the illegal origin of the smuggled furs, Ivey and Wallace had established a pool of "trappers", some legitimate and others who had never trapped, to sign tags certifying that bobcat pelts were taken in accordance with state and federal law. The trappers were paid for their signatures.

At trial various government witnesses, including Hernandez, Pando, Cabezuela, and Estrada, testified that they received smuggled furs from Mexico and sold them to Ivey and Wallace. The witnesses also testified that Ivey and Wallace knew these furs came from Mexico. Ivey and Wallace contend, however, that many of these witnesses also trapped furs in the United States, and it is impossible to tell where a bobcat had been trapped merely by looking at its pelt.

On December 22, 1986, Tinsley Means and Agent Keeler purchased bobcat hides from Flavio Estrada, a known dealer in Mexican furs. Means called Ivey and Wallace to arrange a meeting and solicit their business. Means first spoke to Ivey. Means indicated that some of the bobcat hides were from Mexico, and Ivey stated, "We don't want to buy none of that stuff. You know we can't. Huh? You know what I'm saying." Ivey also mentioned that the phone was not the place to talk about it. Means later called and spoke to Wallace, and a meeting was arranged.

At 10:30 p.m. on December 22, Means and Keeler met Ivey and Wallace at the Van Horn Holiday Inn. At the meeting, Wallace commented that he previously had seen some of the hides at Estrada's house. Keeler then announced his belief that some of the furs were from Mexico, and Wallace

stated, "If someone tells me the furs are from Mexico, I don't buy them. ... If you tell me these furs are from Mexico, I am going to walk." This statement surprised Keeler because Wallace had often bought furs from Estrada, and the tags showed the furs were from Estrada.

On January 15, 1987, Wallace and Ivey returned to the Fur House. The men helped Means and Keeler unload furs which were contained in white sacks with Spanish writing on them. The agents mentioned that they would have had more furs except that part of the load was intercepted by Customs. Wallace inquired whether the furs were from Mexico. When the agents said they were, he said he was leaving. Wallace told the agents, "If I would have known you better, if I had gone to high school with you, maybe we would be doing business right now." Ivey told the agents that the "words" they used were wrong, and if they used the right words, they could do business in the future.

On February 4, 1987, Ivey and Wallace returned to the Fur House and purchased furs. The furs had Texas bobcat tags on them which require the trapper to sign a document stating that the bobcat was trapped in the United States. Ivey and Wallace also required the agents to sign a waiver certifying that the furs were legally taken. Agent Marshall signed the form and stated, "You all were good teachers the last time, we are good learners. If that is what it takes, I will sign it."

At trial Amos Cooper, the bobcat files coordinator for the Texas Parks and Wildlife Department, testified that in February 1987 Wallace called him to verify a rumor that there were two undercover agents working for the Van Horn Fur Company. Numerous trappers also testified that Ivey and Wallace had warned them throughout

the trapping season to be careful of federal agents.

On June 28, 1990, Ivey and Wallace were indicted in a seven-count superseding indictment charging them with:

Count 1—Conspiracy to receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale, after importation of bobcat hides, knowing said hides had been brought into the United States from Mexico contrary to law.

Counts 4, 5, 7—Smuggling—violation of 18 U.S.C. § 545, receiving, concealing, buying, selling, and facilitating the transportation, concealment, and sale after importation of certain merchandise imported into the United States contrary to 16 U.S.C. § 1538(c)(1) and 50 C.F.R. § 23.-11(b)(1).[1]

A jury found Ivey and Wallace both guilty on counts one, five, and seven of the indictment and, in addition, found Wallace guilty on count four. The district court assessed terms of imprisonment for both Ivey and Wallace, and they now appeal.

## II. INDICTMENT

■ Ivey and Wallace allege the indictment is defective for several reasons. First, they argue counts 4, 5, and 7 should have been dismissed for failing to state a criminal offense. In counts 4, 5, and 7, appellants were charged with violating 16 U.S.C. § 1538(c)(1) of the Endangered Species Act which states:

It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any species contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in Article I thereof.

---

1. Counts 4, 5, and 7 of the indictment are each charging similar crimes. The only difference is that each count alleges a different date on which an offense was committed. Count 4 alleges a violation on December 18, 1986. Count 5 alleges a violation on December 22, 1986. Count 7 alleges a violation on February 2, 1988. It should also be noted that: (1) only Wallace was indicted on Count 4; (2) Counts 2 and 3 of

the indictment did not charge the defendants, but, instead, charged a third defendant as to whom the charges were dismissed; and (3) Count 6 of the indictment was dismissed at the time of trial. Note that the statute covers actions other than purchasing. The charges on different dates involved different prohibited activities.

As defined in 16 U.S.C. § 1532(4), "the term 'Convention' means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, *signed on March 3, 1973*, and the appendices thereto." (emphasis added).

At the time the Convention was signed, the only bobcat listed in Appendix II as an endangered species was the *Felis lynx.* The bobcats in question in this case were not *Felis lynx.* The bobcats purchased by Ivey and Wallace were the common bobcat, or the *Felis rufus.* But that species had been added to Appendix II in February 1977.

The Convention standing alone is not the law of the United States because it is not self-executing. It is the implementing legislation, and not the treaty itself, which is the law of the land. *See Man Hing Ivory & Imports, Inc. v. Deukmejian,* 702 F.2d 760, 762 (9th Cir.1983). Ivey and Wallace maintain that the statute is clear, and, therefore, buying the bobcats in question was not illegal because the bobcats were not part of the Convention *signed on March 3, 1973.*

This argument is unconvincing. Appellant's argument would undermine the purpose of the Endangered Species Act which was to protect endangered species "whatever the cost." *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). It would be contrary to the purpose of the act to view the Convention as a static document without the ability to add species as they become endangered or remove animals that are no longer endangered. Amendment of the appendices is necessary to guarantee that species may be added or deleted as required to ensure their protection.

Additionally, article XVII of the Convention specifically provides for amendments to the Convention. If 16 U.S.C. § 1532(4) defines the Convention as the Convention signed on March 3, 1973, and the Convention expressly made provisions for amendments, then the statute's definition included any amendments.

■ To our knowledge no court has addressed the issue of subsequent amendments with respect to the Endangered Species Act, but courts have addressed this issue in other contexts. The Ninth Circuit has held that when a federal statute adopts state law for an Indian reservation, the applicable law is the state law at the time an offense is committed, not the state law at the time the statute was enacted. *United States v. Francisco,* 536 F.2d 1293, 1295–96 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 312 (1976). *See also, United States v. Howard,* 352 U.S. 212, 77 S.Ct. 303, 1 L.Ed.2d 261 (1957). The same theory applies in the present context. "Convention" as referred to in 16 U.S.C. § 1538(c)(1) refers to the Convention as of the date an offense is committed, not the Convention as of March 3, 1973.

Likewise, Ivey and Wallace argue that counts 4, 5, and 7 should be dismissed for failure to state a criminal offense because at all relevant times, the Republic of Mexico was not a party to the Convention. Ivey and Wallace failed to obtain an export permit, but because Mexico is not a party to the Convention it was not required to provide export permits. Appellants claim that because of the Republic of Mexico's status as a non-participant to the Convention, it is legally impossible for any export from Mexico of species listed in Appendix II and III to be contrary to the terms of the Convention. Therefore, appellants maintain, such exports cannot be in violation of 16 U.S.C. § 1538(c)(1).

■ Ivey and Wallace clearly misapply the Convention. Regardless of whether the Convention encompasses non-signatories, the Convention applies to trade within a signatory's jurisdiction. *Convention on International Trade in Endangered Species of Wild Fauna and Flora* ("CITES"), March 3, 1977, 27 U.S.T. 1087, T.I.A.S. No. 8249, arts. IV and X; 50 C.F.R. § 23.14(b) (1990). Pursuant to the terms of the Convention, United States law requires persons subject to its jurisdiction to obtain proper export permits from the country of origin establishing that the species was lawfully taken. 50 C.F.R. § 23.14(b) (1990). The statute, therefore, does not subject Mexico to the terms of the Convention. Instead, it

requires citizens within its jurisdiction to obtain the requisite permits from Mexico if they want to bring bobcat hides into the United States. It is up to the citizen to acquire them. The Convention specifically states, and caselaw has held, that the countries who are parties to the Convention may adopt domestic laws stricter than the measures required by the Convention. *CITES,* art. XIV; *Cayman Turtle Farm, Ltd. v. Andrus,* 478 F.Supp. 125, 130 (D.D.C.1979).

■ As a final complaint as to the indictment, Ivey and Wallace maintain that Count 1 of the indictment was defective in that it failed to state an essential element of the conspiracy offense charged. In Count 1 of the Indictment, Ivey and Wallace were charged with conspiracy to violate 18 U.S.C. § 545, receiving bobcat hides brought into this country "contrary to law." Ivey and Wallace complain that the indictment does not state which elements of the law their actions violated, and, thus, it is incomplete.

The complaint that an indictment for conspiracy is flawed because it fails to allege the elements of the substantive crime "ignores literally decades of black-letter law to the contrary.... It is well settled that an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Graves,* 669 F.2d 964, 968 (5th Cir.1982), *citing, Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301–02, 71 L.Ed. 545 (1927).

The fundamental purpose of an indictment is to inform the defendant of the charges against him so that he may prepare an adequate defense. To be sufficient, an indictment for conspiracy must set out the essential elements of the charge and list the overt acts committed in furtherance of the conspiracy. *United States v. Gordon,* 780 F.2d 1165, 1170 (5th Cir. 1986). The essential element in a charge of conspiracy is the agreement between the parties. In Count 1 of the indictment in

question, the government uses over two pages to describe the agreement and another two pages to describe in detail the overt acts in furtherance of the agreement. The Count went far beyond mere adequacy to apprise Ivey and Wallace of the charges against them and give them an opportunity to prepare a defense.

After a careful examination of the indictment as against all contentions, we conclude that the district court did not err in denying the motion to dismiss the indictment.

### III. JURY CHARGE

Ivey and Wallace assert the trial judge's jury instructions were defective in two ways: failure to specify the elements of the crimes and failure to instruct as to the element of specific intent.

■ When reviewing the propriety of a jury instruction, this Court determines whether the charge, as a whole, is a correct statement of the law and whether it clearly instructed the jurors regarding the principles of law applicable to the factual issues before them. *United States v. Stacey,* 896 F.2d 75, 77 (5th Cir.1990). It is well-settled that as long as the jury charge accurately reflects the law and the facts of the case, a district judge is vested with broad discretion in formulating the charge, and this Court will not lightly disturb his judgment. *United States v. Casto,* 889 F.2d 562, 566 (5th Cir.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). The determination of the adequacy of the charge must be made in the full context of the trial. *United States v. Rubio,* 834 F.2d 442, 447 (5th Cir.1987).

■ Ivey and Wallace complain the jury instruction for the conspiracy count is defective for the same reason they claim the indictment was defective: the elements of the underlying substantive statutes or prohibitions were missing. An examination of the record indicates this argument is without merit. The charge instructed the jury that it must find that there was a conspiracy and that the defendants knowingly received and concealed merchandise imported

into the United States, knowing that the merchandise was imported contrary to law. The jury was instructed that it was contrary to law to import bobcat pelts without proper permits. The charge properly apprises the jury of the elements and the underlying offense constituting the object of the conspiracy. This instruction is sufficient.

■■■ The other jury instruction error claim by Ivey and Wallace is that the trial judge erred in failing to instruct the jury that the statute required specific intent. They argue 16 U.S.C. § 1538(c) is a statute that requires knowledge of the law by the accused. Their argument is wrong. The words of Section 1538(c) as well as its legislative history indicate Congress did not intend for it to be a specific intent crime. "The conferees do not intend to make knowledge of the law an element of either civil penalty or criminal violations of the [Endangered Species] Act." H.R.Conf. Rep. No. 1804, 95th Cong., 2d Sess. 26, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9484, 9493.

No court has addressed the issue of whether 16 U.S.C. § 1538(c) is a specific intent statute, but the intent requirement of the related statute, 16 U.S.C. § 1540(b)(1), has been analyzed. Those cases held that the government must only show a defendant acted with general intent to commit the act because Congress did not intend to make knowledge of the law an element of criminal violations. *See United States v. Billie*, 667 F.Supp. 1485, 1492 (S.D.Fla.1987); *United States v. St. Onge*, 676 F.Supp. 1044, 1045 (D.Mont.1988).

Adopting the appellants' argument that Section 1538(c) requires specific intent would thwart the purpose of Congress in enacting the Endangered Species Act. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 ·L.Ed.2d 117 (1978). *See also United States v. Nguyen*, 916 F.2d 1016, 1018–19 (5th Cir.1990).

The requested instruction on specific intent would render the Act ineffective because it would be nearly impossible to show that an accused intended to violate the Act. The Act in question is a regulatory statute to preserve endangered species, and criminal penalties attached to regulatory statutes should be construed to effectuate their regulatory purpose. *See United States v. Johnson & Towers, Inc.*, 741 F.2d 662, 666 (3d Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985).

## IV. SUFFICIENCY OF THE EVIDENCE

Ivey and Wallace both challenge the sufficiency of the evidence to support their convictions, alleging the evidence was insufficient to show: (1) they knew the pelts were from Mexico; (2) the pelts actually had come from Mexico; (3) the pelts involved were pelts of an endangered species; or (4) the witnesses were credible. We will address each of these charges individually.[2]

■■■ In reviewing a challenge to the sufficiency of the evidence, this Court must determine whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt, and we view all evidence and any inferences that may be drawn from it in the light most favorable to the government. *United States v. Hatch*, 926 F.2d 387, 392 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir.

---

**2.** In his brief, Wallace in passing challenges the sufficiency of the evidence as to a violation of Count 4 of the indictment. He claims there is no evidence as to anything taking place on December 18, 1986. Because he did not raise this issue prior to appeal and because the sentences for all the counts are to run concurrently, we see no need to address this complaint.

1989) (quoting *Coggeshall v. United States,* 69 U.S. (2 Wall.) 383, 17 L.Ed. 911, 914–15 (1865)). The standard of review is the same whether the evidence is direct or circumstantial. *United States v. Bryant,* 770 F.2d 1283, 1288 (5th Cir.1985), *cert. denied,* 475 U.S. 1030, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986).

■ Ivey and Wallace claim the evidence is insufficient to show they had knowledge the pelts were from Mexico. All the circumstantial evidence, however, when viewed together, is sufficient for the jury to conclude Ivey and Wallace had the requisite knowledge. The following individuals all testified that Ivey and Wallace knew the furs were from Mexico: Adan Hernandez, Mario Pando, Jose Cabezuela, Flavio Estrada, Ruben Ortega, Felipe Garcia, and John Keeler. Furthermore, the incident in which Ivey told Keeler that if he used the right words, they could do business in the future supports the conclusion that Ivey and Wallace had knowledge.

■ Appellants contend the evidence does not prove the pelts in question actually came from Mexico. It is impossible to tell whether a given hide is from Mexico or Texas, and, according to Ivey and Wallace, Agent Keeler only believed the bobcat hides were illegal. He did not see the hides come across the border. If the hides were not from Mexico, then no laws were broken.

In support of the assertion that the hides came from Mexico, Felipe Garcia testified that he personally trapped two bobcats in Mexico and sold the hides to Ivey. Some of the hides in question were bought from a known dealer in Mexican furs. Telephone records were also submitted into evidence showing calls placed by Ivey and Wallace to Amando Brito–Laura, a trapper in Mexico. Hernandez testified that Ivey and Wallace would often inform him when a shipment of furs would be arriving from Mexico. Furthermore, the furs were delivered in white sacks with Spanish writing on the sides, and several government witnesses testified that in their opinion they were convinced that the furs were from Mexico. Although much of the evidence is circumstantial, a review of the record as a whole shows there was evidence sufficient to uphold a jury verdict that the hides in question were from Mexico.

Ivey and Wallace also assert the evidence is insufficient to show the pelts in question are of a specific subspecies listed on Appendix II of the Convention. Throughout the trial, the pelts were referred to as "bobcat", "cat", "Coahuila cat", "Mexican cat", and "Mexican bobcat." Appellants believe the government failed in proving the animals involved were from a specific subspecies and that the subspecies is restricted by law. At trial, the judge instructed the jury that the hides were a species restricted by law, instead of letting the jury make that determination.

■ The argument is without merit. Appendix II of the Convention lists *Felidae spp.* which includes all species of cat exclusive of the common house cat. The question of whether a "bobcat" is a species listed in Appendix II is a question of law for the trial judge and was properly withheld from the jury's consideration. The testimony of the numerous trappers was sufficient to indicate they were dealing with a species of cat other than the common house cat.

Finally, Ivey and Wallace question the sufficiency of the evidence because of bias of government witnesses. Appellants assert that the evidence is insufficient because all of the government's witnesses had "an axe over their heads" and would testify to anything the government wanted out of fear of deportation or conviction for other crimes.

■ During cross-examination, Ivey and Wallace's attorneys questioned the witnesses as to their biases. The jury concluded that the witnesses were credible. It is the sole province of the jury, and not within the power of this Court, to weigh conflicting evidence and evaluate the credibility of witnesses. *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir.1969) (en banc); *United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir.), *cert. denied,* 479 U.S. 868, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986);

*United States v. Cantu,* 876 F.2d 1134, 1137 (5th Cir.1989).

After a careful review of the entire record, we are convinced the evidence is sufficient to support the convictions of Ivey and Wallace.

## V. ENTRAPMENT AND OUTRAGEOUS GOVERNMENT CONDUCT

■■■ Ivey, individually, alleges his conviction under count 5 should be reversed because of entrapment or, in the alternative, outrageous government conduct. Ivey requested a jury instruction on the defense of entrapment, but the trial judge did not grant this request. The trial court acted on the ground that the defense of entrapment was unavailable to a defendant as long as the defendant denied committing the acts which constituted the crime. In so holding, the trial court followed the law of the circuit as it existed until 1988. *United States v. Henry,* 749 F.2d 203, 205 (5th Cir.1984) (en banc). But the law had been changed at the time the defendants were tried in 1990. The Supreme Court held in *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) that the entrapment defense was available to a defendant even though he or she denied committing the acts upon which the criminal charge is based. We implemented the holding in *United States v. Jones,* 839 F.2d 1041, 1053 (5th Cir.), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988). There we said:

> [T]he Supreme Court now would permit a Defendant to assert entrapment while denying any or all elements of the crime, including intent. Hence, while the result in *Mathews* is not inconsistent with the *Henry* rule, we conclude that *Henry* is no longer controlling law in this circuit.

■■■ We conclude that the reason the trial judge used in refusing to give an instruction on entrapment was incorrect. But there remains the question whether there was error in failing to give the instruction. In all entrapment cases, the threshold question is the defendant's predisposition to commit the crime. Before the defense of entrapment can be raised, there must be a showing of government inducement and a lack of predisposition to engage in criminal conduct on the part of the defendant. *United States v. Cantu,* 876 F.2d 1134, 1137 (5th Cir.1989); *United States v. Nissen,* 928 F.2d 690, 693 (5th Cir.1991); *United States v. Kang,* 934 F.2d 621, 624 (5th Cir.1991). The standard is the same in reverse sting operations. *United States v. Knight,* 917 F.2d 1, 2 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 533, 112 L.Ed.2d 543 (1990).

■■■ The evidence in this case amply supports the conclusion that Ivey was predisposed to purchase smuggled bobcat hides. It shows that Ivey and Wallace had established a network of trappers who falsely signed the bobcat tags stating that the bobcats were legally trapped. Ivey and Wallace also dealt with known dealers in Mexican furs. Telephone records presented at trial established that Ivey and Wallace made calls to contacts in Mexico, with the strong inference that they were arranging delivery of bobcat hides. Ivey's history in the fur business unmistakably evinces a predisposition to purchase bobcat hides from Mexico.

Similarly, Ivey cannot claim he was entrapped because he did not know these particular bobcat hides were from Mexico. At trial, numerous witnesses testified that Ivey knew the hides were from Mexico. In his brief, Ivey tries to discredit these witnesses' testimony because of their bias towards the government. But again, the credibility of these witnesses was decided by the jury. It is not a question for this Court. Ivey's knowledge that these furs were from Mexico can be deduced from his confrontation with Means and Keeler when he told them they used the wrong "words", and if they would use the right words, Ivey would do business with them in the future. Ivey later returned and bought the bobcats when the agents used the right words. Although it was not submitted under the guise of entrapment, the issue of whether Ivey knew the bobcats were imported contrary to law was submitted to the jury, and the jury determined that Ivey did know.

Thus, although the trial judge gave an incorrect reason for not instructing the jury on entrapment, no instruction was necessary. Based on the volume of evidence indicating Ivey's knowledge, and Ivey's predisposition as revealed by his prior dealings in Mexican bobcats, there was not enough evidence of entrapment to justify submitting the issue of entrapment to the jury. *See United States v. Stanley,* 765 F.2d 1224, 1235 (5th Cir.1985) (holding that "the entrapment issue need not be presented to the jury if the evidence does not sufficiently raise the issue").

█ Ivey asserts that even if he was not entrapped the government's conduct was outrageous. Although a defendant may be predisposed to commit a crime, the government's conduct may be so outrageous as to violate the defendant's constitutional due process rights. This defense, however, is only available in the rarest and most outrageous circumstances. *United States v. Nissen,* 928 F.2d at 693; *United States v. Allibhai,* 939 F.2d 244, 248 (5th Cir.1991); *United States v. Evans,* 941 F.2d 267, 271 (5th Cir.1991).

█ Ivey claims the government's conduct was outrageous because the agents purchased bobcat hides believed to be illegally imported and then deliberately solicited other persons to buy the illegal furs. After being told by Ivey and Wallace that they did not want to purchase hides illegally imported from Mexico, the agents sold the furs to Ivey and Wallace and signed a form stating the furs were legal. Ivey asserts that it is outrageous conduct for the government to create, manufacture, or otherwise persuade an accused to engage in illicit activity the government instigates for the sake of bringing charges against that person.

The government's activity in this case falls far short of that which is necessary to invoke the defense of outrageous government conduct. This Court previously has held that reverse sting operations do not constitute outrageous conduct. *United States v. Knight,* 917 F.2d at 2. We have also held that a defendant who actively participates in a crime cannot avail himself of the outrageous conduct defense. *United States v. Kang,* 934 F.2d at 629; *United States v. Nissen,* 928 F.2d at 693. Al-

though the government initially contacted Ivey and Wallace, they kept returning even after being told the hides were from Mexico. By returning to purchase the furs, Ivey and Wallace were active participants.

In a recent case cited earlier, we denied the defense of outrageous conduct even though DEA agents approached the defendant and offered to help him manufacture drugs, phoned him to pursue the arrangement, supplied the expertise, sold the defendant equipment, and supplied him with the laboratory site. *United States v. Evans,* 941 F.2d at 270. The government's conduct in the *Evans* case is much more extreme than the conduct in this case.

█ Further, we are not persuaded by the fact that the government signed a form stating that the furs in question were legal. In *Nissen,* government agents remained silent when the defendants were told by another party that their actions were lawful. We denied the defense of outrageous conduct stating that we would not "consider the government's conduct in a vacuum.... Allegations of outrageous government conduct are similarly unavailing where the defendant is actively and willingly participating in the criminal conduct leading to his arrest." *United States v. Nissen,* 928 F.2d at 693. Thus, the actions of Agents Keeler and Marshall do not constitute outrageous conduct.

## VI. CONCLUSION

We hold the convictions of Ivey and Wallace must be upheld. The indictment was adequate to allow the appellants to prepare a defense, and the jury instruction properly explained the law to the members of the jury. The evidence was sufficient, when viewed cumulatively, to support the conviction. Furthermore, the claims of entrapment and outrageous conduct are unavailing. We affirm the judgment of the district court.

AFFIRMED.